Haynes, J.
These cases have Been heard ‘úpon petitions in error and upon the arguments of counsel; and the principal decision of the cases, in the main, all turns upon the same state of facts. The actions in the court of oommon pleas were brought 'by the Second National Bank, by Isaac N. Walker & Co., and R. Meier & Co., in separate suits, each claiming to'hold 'Calvin Bronson, then in full life, liable upon certain claims that each held originally against the firm of Charles R. Messinger & Company, but which claims had been compromised in the year 1884, at a time when Mr. Messinger practically failed and compromised with his creditors, seeking to set aside that compromise and to hold Calvin Bronson liable, for the reason that this partnership had been concealed and had not been made-known to the creditors at the time of the settlement, or at any other time, and averring that they had brought a suit as soon as they had ascertained that there 'was a liability on the part of Bronson.
*562 The facts of the case, somewhat in detail, are these: Mes-singer & Company at one time carried on business in the city of Toledo, in the cutting and manufacture of leaf tobacco-into smoking tobacco and other brands, and in that firm Calvin Bronson had been a member. That firm, however, was dissolved, and for some years Charles R. Messinger carried on the business alone, under the firm name of C. R. Messinger & Company. Finally, in the year 1878, an arrangement was made between Bronson and Mr. Messinger, as the testimony discloses, whereby Bronson was to let. Messinger have about $10,000 in money. He did let him. have that money at different times and in different sums, and received from Messinger certain notes, payable to Bronson! with interest at eight per cent, per annum. Messinger testifies that at the time this arrangement was made, at the-time he received this money, and at as part of the consideration for receiving it, it was further agreed that Bronson should receive one-fourth of the net profits of the business-which was then being carried on; and the agreement further provided that if the profits should not exceed the amount of eight per cent, interest on the notes, that Messinger was to. pay eight per cent, interest on the notes in that event. It was further agreed, as Mr. Messinger testifies, that Messinger was to receive during that time a certain sum per year for his. services in the business — $1,500 a year, I think, at first, and then $2,000 a year. And it was further stated by Mr. Mes-singer that Mr. Bronson had agreed at the same time to also-indorse paper at the bank for Messinger for a certain amount. The testimony discloses that Bronson did, from time to time,, indorse notes at the Second National Bank for Mr. Messinger,. Messinger having received the money, and the business proceeded, and at the end of the first year (this having occurred,. I think, in the fall of 1878), upon the first of January, when he took an inventory and the profits were ascertained, Mr. Messinger gave to Mr. Bronson, as he testifies, a note-representing one-fouvth the amount of the net profits from the time the arrangement was made down to the first of January; and he did so during the year 1879; and in the-year 1880 the profits were not visible. The business, evidently, was running behind, for some reason, and in the summer of 1880 Mr. Bronson, as Messinger testifies, notified him that on the 1st of January, 1881, the arrangement between them would terminate and end. And accordingly, at the end of that time, it did, as he testifies, end and cease. The notes which were given for the profits were paid'after-wards by C. R. Messinger.
*563 Messinger continued in business from 1881 to 1884, in June sometime, when he found himself in a failing condition. The business waB insolvent. 'Thereupon a schedule of debts was made out — a statement made out to be submitted to his creditors, and upon that exhibit Mr. Bronson was represented as a creditor of C. R. Messinger & Company to the full amount of the notes which had been taken for the original $10,000,and in some sums in addition,for which he was held as indorser, and in the compromise which was made, whereby the creditors were to receive 25'per cent, on the dollar, he participated with the other creditors. The testimony of Mr. Almon Hall has also been given in the case, in which it is stated by him that a short time prior to the making of this settlement he, acting thea for Mr. Messinger, and in fact drawing up the articles of compromise afterwards — and perhaps the assignment,! don’t remember about that — sent for Mr. Bronson to call at his'office, and there,in the presence ■of Mr. Messinger, they had a conversation, in which Mr. Hall stated to Mr. Bronson that he had learned of this arrangement, and stated to him the leading facts in regard to it, and stated to him further,- that that being true, he would be liable to be held as a partner, and Mr. Hall states that Mr. Bronson replied that he had been so advised by his counsel. Upon his examination, Mr. Messinger’s attention was called to this conversation, but he denied having heard it. Also, later on in the trial, he was called to the stand on behalf of defendant, and then stated that he didn’t Bear it.
Now, these are the leading facts in regard to the. oral testimony. There is some negative testimony, or, rather, there is testimony that should bear upon this subject. The books of the concern are not iñ'existence. Sometime subsequent to the failure, Mr. O. R. Messinger sold them to the paper dealers. There was a memorandum book, which, it was stated, would throw some light upon this subject, which has been lost and cannot be found. The original notes themselves are lost, and the indorsements which were made upon them. The testimony of Mr. Messinger is that whenever he' made these notes for profits, he at the same time indorsed upon the back of the original notes which had been given by him to Mr. Bronson the words “interestpaid”' — ■ and perhaps the testimony is that the majority of them were so endorsed by Mr. Bronson himself.
Now, I believe, in outline, these are the leading points in the case, and the controversy here is whether, upon these facts, Mr. Bronson can be held as a member of the firm of C. R. Messinger & Company, not whether he can as between *564 himself and Mr. C. R. Messinger, but whether he can by the creditors be held as a member of the firm, for the firm debts.
Preliminary to this, and before proceeding further, the question is made as to whether the Second National Bank can recover upon the claims updn which it bases its right to recover finally — for this reason, and growing out of the state of facts: The notes which were originally sued upon were notes which were executed after 1881. Upon its transpiring upon the trial that upon the 1st of January, 1881, this arrangement terminated, it obtained leave of the court of common pleas to amend its pleadings, in which it set up chat the original indebtedness — the money loaned — was loaned some time prior to 1881, by the bank to Messinger & Company, and during the time that this arrangement existed, it is claimed, between Messinger aüd Bronson. And a controversy then arose as between the bank and the de' fendants as to whether there had been a renewal of these notes from time to time, or whether the notes had in fact been paid off and gone out of existence and new notes given to the bank by Bronson and Messinger, in which case there would be no liability, because the indebtedness had accrued after 1881, We think, after discussing the matter, that the testimony shows that there was a line of discounts and an agreement for discounts, by the bank to Messinger & Co., of which he availed himself, and which was carried forward from time to time, of the original loans by renewal notes from time to time down to the time that the last notes were given. It may be that they were not always given at the same moment, or even perhaps the same day, but they were given under the same arrangement. It is true, perhaps, that at the time the notes were paid, that is to say, the business was transacted, by a new note being given, or by a check being given by Messinger & Company, to take up the old note,and the new note put in the bank; sometimes the new note, perhaps, was not put in the bank for twenty-four hours after the old note was taken up. It was said that at times Messinger would have more than money enough in the bank to pay that particular note, and upon that there was some testimony given; but we are clearly of the opinion that within the rules which should govern the renewal of notes and the continuation of a debt, that there was such a renewal of the notes and continuation of the debt that the plaintiff would have a right to sue.
Coming back tó the question as to whether there was in fact a partnership, or whether there was such an interest that the plaintiff should have a right to hold Bronson as a partner *565 in the firm of Messinger & Company, we will say that we have listened with attention to the able arguments of counsel, and we have endeavored to read carefully the leading cases cited by them.
On the part of the plaintiff in error in the first case, defendants below — the Bronson estate — the cases cited are: 28 Ohio St. 319; 13 Rhode Island, 27; 97 N. Y. 159; 71 Ill 148; and the case of Cox v. Hickman, a leading casein England, which may be found in various reports, but.I have it here as found in the House of Lords’ Cases, vol. 8, page 267.
Counsel for defendant in error have cited 7 Ohio St. 172, and quite a number of text books. They have also referred the court to all the cases m the Ohio State Reports touching the question of liability upon partnership agreements. However, upon an examination of the cases, the leading cases are cited in 7 Ohio St., and 28 Ohio St., and the other cases which have been cited.
It would be very interesting and even instructive, to discuss these various cases and to see the manner in which the decisions of law seem to grow and expand and become rules. The law of Ohio was at one time supposed to be settled in the case of Wood & Oliver v. Henry Valette and Harry Lewis, 7 Ohio St. 172, where, in the third division of the syllabus, it is stated: __
“That a contract between parties to share in the net profits of a business, to the carrying on of which they respectively contribute, necessarily makes them partners as to third persons dealing with the firm.”
Afterwards, in the 28 Ohio St., the Supreme Court Commission, in the case of Harvey v. Childs & Potter, p. 319, give these as syllabi in the case:
“The liability of one partner for'the contracts of another, when not estopped from denying the liability, is founded on the relation they sustaiirof being each principal and agent in the joint business. This relation is, therefore, the true test of partnership, and the liability rests on the ground that it was incurred on the express or implied authority of the party sought to be charged.
“Participation in the profits of-a business, though cogent evidence of a partnership, is not necessarily decisive of the question. The evidence must shew that the persons taking the profits, shared them as principals in a joint business, in which each has an express or implied authority to bind the other.”
While the first rule is a very simple one, the last rule is inclined to make a man think some before he arrives at a *566 conclusion. What I mean by that is that in my judgment, it leaves the question as to whether there is a partnership one that will necessarily always be in a good deal of doubt, unless it can be shown definitely that there was an express agreement that the parties should become partners; or, perhaps, a better way of stating it would be, that they should so agree as to what would be done that it would show that they had contributed either capital or labor specifically to carry on the business, with the further agreement that they would be sharers in the profits and losses of the business, which would make an express contract of partnership.
The case in 28 Ohio St. refers to this case of Cox v. Hickman as having changéd the rule in regard to sharing thepofits and losses doctrine, as it is called. We have given that case very careful attention, and while it has gone so far into history as to be old enough to establish that doctrine, nevertheless, when it was originally decided, the decision of the House of Lords, in our judgment, did not establish any such doctrine. That case, I may say, was this: Smith •& Son, carrying on the business of manufacturing iron in England, had become involved, perhaps insolvent, and, rather than go into bankruptcy, they made an arrangement whereby* they conveyed to trustees all of their property with the agreement that the property should be sold down to four thousand pounds, and that about four thousand pounds of their property should be left in the business, and then that the business should be carried on by the trustees, and from time to time the net profits of the business should be divided among the various creditors by the trustees until the whole of the creditors were paid, and then the business and all the property remaining should be conveyed by the trustees to Smith & Son. The business had been a profitable one, the good will of the concern, evidently, was deemed to be very valuable, and the creditors seemed to be very desirous to carry* out the arrngement, and, of course, Smith & Son were desirous to do so. There was an understanding by the trust agreement whereby the creditors might from time to time be called together in a meeting, and that meeting to decide at any time whether the business should proceed, os whether it should be stopped and wound up, or closed out. Those are the leading facts in the case. The business went forward, but did not prove as profitable as was expected, and certain drafts had been drawn upon the trustees and accepted by the parties, and suit was brought against certain of the creditors and the trustees, alleging that they were co-partners in the carrying on of this business because they were sharers *567 in the-profits; that the trustees_ were liable because they had given the acceptances, and the creditors liable because they were made sharers in the profits; and the court of common pleas held the creditors liable. In the Exchequer Chamber, of six justices,' they stoo.d_three to three. Thefeupon it went to the House of Lords. And thereupon the House of Lords propounded the.question to the twelve judges, and they stood six to six, and each of them rendered a loqg opinion, and thereupon it was held that there was no liability on the part of the creditors. They did not, in terms,- overrule the celebrated case of Waugh v. Carver, foundin Smith’s Leading Cases, with which we are all familiar; but they held — and that was the substance of the issue joined there— that this was practically the. carrying on of the business of Smith & Son through these trustees for the purpose of making money out of the assets and keeping the good will of the business, and that they should make dividends from time to time purely for the purpose of paying the creditors; in short, that it was only a method-adopted by Smith & Son for the purpose of carrying out their desire to have the business pay off the creditors and have something left for themselves. They discuss the auestion of the profit doctrine, it is true, and they expressed some individual opinions in regard to it: but, so far as the case itself is concerned, it will be found, by carefully reading the case, that that was the basis upon which they rendered their final decision. Of course, during all of -this. discussion by so many learned judges, there are a great many things said and a great many points made which are instructive, but time will not permit us to go through more of the case.
In the Law Reports, Chancery Division, vol. 7, p. 511,may be found the case of Delhasse in re Megevand, in which the question came up, and in which the statement is made by Chief Justice Bacon, as follows:
“No doubt at one time it might have been said that the law on the subject had been questioned (the ground of sharing the net profits); but the criticisms -which have been passed on the case of Waugh v. Carver, have thrown such light upon it that it is not worth while to go back to the case of participation in profits in test of partnership, because the case of Cox v. Hickman has completely settled the law, and the judgment in that case goes principally on the ground that the relation of principal and agent must be established before the dormant partner or the person lending his money, can be held to be liable for the debts contracted in the business. ”
*568 And the judges of the court proceed to discuss the case and deliver opinions seriatim, and Lord Thesiger, who, I believe, is the author of Pollock on Contracts, also discusses the question. He concurred in reversing the Cox v. Hickman case. He speaks of an act which had been passed, and says:
“Now, apart from the act, the law applicable to this case has been laid down in tolerably distinct terms by the House .of Lords in Cox v. Hickman, and it is perfectly true that the House of Lords, in that case, laid it down that the proposition that a participation in profits constitutes an invariable test of partnership is not one which can be maintained. Lord Cranworth gives as the test that which, no doubt, must now be taken as the proper test to be applied to all these cases, namely,, that the real ground of liability as a partner is that the trade has been carried on by persons acting on behalf of the person whom it is attempted to make liable as a partner. But, in the very same page in which these words occur, Lord Cranworth also says that the participation in profits is, in general, a sufficiently accurate test, and that the right of participation in profits affords cogent, often conclusive, evidence of a partnership. If that be so, It follows as a logical consequence that if, in addition to participation in profits, the arrngement provides for a participation in losses, and also contains stipulations tantamount to the ordinary stipulations which one would expect to find in the' case of a dormant partner, it is an a fortiori reasoning-in such a case in favor of a partnership, and Lord Cranworth’swords “cogent and often conclusive”must be changed into the words “still more cogent and often more conclusive evidence of such a partnership. ”
And then are disclosed some of the facts in that case, or an agreement which was entered into by those parties. Again, he says, and I read from page 580:
“And I observe that Mr, Justice Lundley, in his book on Partnership,' in speaking of the different propositions which may be deduced from the decision in Cox v. Hickman, says, among other things, that prima facie the relation of principal and agent is constituted by an agreement entitling one person to share the profits made by another to an indefinite extent. ”
And the judge remarks:
“That appears to'me to be an accurate expression of the law as evolved from Cox v. Hickman.”
Coming back to Ohio, to the case in 7 Ohio St., we find that case decided upon a contract. Henry Vallette, who .was *569 evidently constructing the White W-atei Valley canal in the state of Iowa', entered into an "agreement with one ■ Harry Lewis, at Cincinnati, whereby he agreed to make a loan to Lewis .in the sum of $1,000 and draw for the same'in merchandise as he would want it. He further agreed to use his influence in "getting his contractors to patronize Lewis’ store and buy their goods of him. In consideration of the foregoing, Lewis agreed to pay Vallette in merchandise, half the profits made in his store or in any other store that he might establish on the line of the canal within the next twelve months. Lewis agreed to keep the books so as to" be able to arrive at the exact amount of the profits. And it was further provided that Vallette should not be responsible for any loss connected with . the concern more than the profits, and that nothing in the agreement should be construd to make a partnership between Lewis and Vallette. Now, it was very evident that Vallette was intending to make all the profits out of the business that he could, as he was going to have half of the profits, and he put in the money and was going to take it out in goods from time to time. The court held in that case, following Waugh v. Carver, that a participation in the profits constituted Vallette a partner, and he was held liable for the debts. That case, to-day, is law in Ohio; it has -not .been disturbed in any court so far as we know; that is to say, it has not been overruled in any form.
Now, the case of Harvey v. Childs & Potter is this — and they refer to the case of Wood v. Vallette, and also to the case of Leggett v. Hyde, 58 N. Y. 272, to establish the same doctrine, and, as I understand it, refer to it as having decided that the original case was proper.
Potter was purchasing hogs from time to time, at any rate, he desired to purchase some hogs for shipment, 'and he went to Childs and asked him to loan him the money to make the purchase; he asked Childs to advance the money and take an interest in the hogs, which he refused. Potter then proposed that if Childs would let him have the money to pay for some hogs that he had bought and also some others that he wished to buy, sufficient to make two carloads, that he, Childs, should take possession of the hogs when delivered at Loudonville, and take them to Pitts-burg, and sell them and take his pay out of the proceeds and that he” might have one-half the net profits of the transaction. Childs accepted the proposition, and advanced to Potter, $2,500. Afterwards, without the knowledge of Childs, Potter bought the hogs of Harvey on his own credit, and they constituted a part of the two car-loads referred to. *570 Childs sold the hogs in Pittsburg, and appropriated the proceeds to reimburse himself for the money he had advanced. No profits were made. The avails of the sale were insufficient to pay the amount advanced by Childs, and Potter paid the deficiency to him. Harvey brought suit against Childs and Potter, claiming that they were co-partners in the transaction. The case was carried to the Supreme Court of the State,and the syllabus of that decision I have already read. In deciding the case the court referred-to the case .of Cox v. Hickman, and also to the case of Eastman v. Clark, 53 N. H. 276; that is, it commences on page 276 and is very lengthy. Speaking of the case of Wood v. Valette, they say:
“In the absence of any known stipulation to the contrary, every party of a trading firm within the scope of the joint business, in contemplation of law, is clothed with implied authority to enter into simple contracts on behalf of the firm in furtherance of the business of the partnership, and thereby bind each member of the firm. Where therefore, as in the case of Wood v. Vallette, 7 Ohio St. 172, and the case of Leggett v. Hyde, 58 N. Y. 272., money is advanced, to be used in a trading busjness, and returned in a year with a share of the profits made during that time, it may well be implied that the business was conducted on behalf and by the authority of the person advancing the money and sharing the profits, for i't is to the continuing trade, in the ordinary way, that he looks for his profits.
“But such cases are plainly distinguishable from one where money is advanced, to be embarked in a single transaction, where no credit is contemplated. In such case there is no ground for the implied authority to incur debts, such as exists in regard to a general trading business.”
And thereupon he proceeds to discuss the facts of this particular case between Childs and Potter, and holds that there was no contemplation that the parties would carry on a general business — it was simply to be a purchase of two car-loads. There was no opportunity given to buy on credit. The money for the purchase of the whole two car-loads was supposed to be in the hands of Potter, by Childs, and the two carloads were to be purchased with that money. The court holds that there was no general liability; that is to say, Childs was not liable as a partner.
Now, coming back to the case before us, we, after a very full and careful discussion of the matter, think that under these two decisions in Ohio — the 7th and 28th Ohio St. — that upon the facts of the case we ought to confirm the mdgment of the Court of Common Pleas. It seems to us *571 distinctly evident that the mone^ which was advanced by Mr. Bronson was advanced with the expectation that it was to be used in the busin iss of O. B. Messinger & Co. That was a growing business. It was the expectation of the parties that it would be carried forward in the usual and ordinary manner of carrying forward a commercial business of that kind; that leaf tobacco would be purchased to be manufactured into cut tobacco, and that the tobacco would be sold under the expectation that profits would be realized, and Bronson was to have one-fourth of them. In order to carry forward that business, he was not only willing to advance this $10,000, but he was willing also to become security to the Bank to the further extent of $10,000 — giving his credit to the concern. It was further provided, that Messinger was to have a certain sum of money for giving his active attention to the business; and that, certainly, would not have been necessary had it been Messinger’s business only and exclusively, because it seems to us that he would have been entitled to carry on his own business without any arrangement of that kind. It is true that it might be claimed that that was simply done to reduce the amount of profits in some form, but that is not the,natural view to take of it. The natural view, we think, to be taken is, that Messinger had to give his active attention to the business, and as between him and Bronson, he was to be allowed some $2,000 a year for his services as active manager of the concern. Now, it seems to us that on that state of facts there was a community of interests in that concern; it. seems to us certain that there was an authority granted there by Mr. Bronson that this money might be used in the concern, and that Mr. Messinger might go forward and contract debts, for the benefit of the concern, and out of the contracting of these debts, might ultimately expect to make a profit; so that, trying the tests that are laid down by the authorities for testing the question as to whether there was a partnership or not, so far as third parties, a least, are concerned, we think that the weight of authority — we think that under the Ohio rules and the decisions of the Supreme Court as laid down in 7 Ohio St., that our duty is to affirm the judgment. We therefore hold that the judgment of the court of common pleas should be affirmed, and the costs in error will be paid'by the plaintiff in error, and reasonable cause will be certified for the filing of the petition in error,so that there will be no penalty.
In the case of Isaac N. Walker v. C. R. Messinger et al., and the case of R. Meier & Company v. Charles R. Messin *572 ger et al., in both oases, it is found by the court that the debts accrued subsequent to the 1st of January, 1881. It being shown that this agreement had terminated at that time, the court below' held that there was no liability on the part of Bronson during his life time, or of his estate after-wards, to Walker or to Meier &Co., and in those cases judgment w'as rendered in the court below for Bronson, and in each of those cases the judgment of the court of common pleas will be affirmed at the costs of the plaintiffs in error.
James H.. Southard and Guy W. Kinney, for Bronson estate. .
Almon Hall,, and Pratt & Wilson, for creditors.